Gideon Kracov (State Bar No. 179815)
LAW OFFICE OF GIDEON KRACOV
801 S. Grand Avenue, 11th Floor
Los Angeles, CA 90017-4645
Tel: (213) 629-2071
Fax: (213) 623-7755
Email: gk@gideonlaw.net

Jason Weiner (State Bar No. 259264)
WISHTOYO FOUNDATION
VENTURA COASTKEEPER
9452 Telephone Rd. #432
Ventura, California 93004
Tel: (805) 658-1120
Fax: (805) 258- 5107
Email: jweiner.venturacoastkeeper@wishtoyo.org

Attorneys for Plaintiff
WISHTOYO FOUNDATION, and VENTURA COASTKEEPER,
a program of the WISHTOYO FOUNDATION

# UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| WISHTOYO FOUNDATION, VENTURA COASTKEEPER, a program of THE WISHTOYO FOUNDATION, <br><br> Plaintiff, <br><br> vs. <br><br> WIGGINS LIFT CO., INC. a corporation, DOES 1 through 10, <br><br> Defendants. | Case No. _____ <br><br> COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF AND CIVIL PENALTIES <br><br> (Federal Water Pollution Control Act, 33 U.S.C. §§ 1251 to 1387) |

WISHTOYO FOUNDATION, a California non-profit corporation, and

VENTURA COASTKEEPER, a program of the Wishtoyo Foundation, and

(collectively "WISHTOYO" or "Plaintiff") by and through its counsel, hereby alleges:

## I.   JURISDICTION AND VENUE

1.     This is a civil suit brought under the citizen suit enforcement provisions of the Federal Water Pollution Control Act, 33 U.S.C. § 1251, *et seq.* (the "Clean Water Act" or "the Act"). This Court has subject matter jurisdiction over the parties and the subject matter of this action pursuant to Section 505(a)(1)(A) of the Act, 33 U.S.C. § 1365(a)(1)(A), and 28 U.S.C. § 1331 (an action arising under the laws of the United States). The relief requested is authorized pursuant to 28 U.S.C. §§ 2201–02 (power to issue declaratory relief in case of actual controversy and further necessary relief based on such a declaration); 33 U.S.C. §§ 1319(b), 1365(a) (injunctive relief); and 33 U.S.C. §§ 1319(d), 1365(a) (civil penalties).

2.     On January 17 and February 7, 2017, Plaintiff provided notice of WIGGINS LIFT CO., INC. ("WIGGINS" or "Defendant")'s violations of the Act, and of its intention to file suit against Defendant, to the Administrator of the United States Environmental Protection Agency ("EPA"); the Administrator of EPA Region IX; the Executive Director of the State Water Resources Control Board ("State Board"); the Executive Officer of the California Regional Water Quality Control Board, Los Angeles Region ("Regional Board"); and to Defendant, as required by the Act, 33 U.S.C. § 1365(b)(1)(A).  True and correct copies of the initial and supplement notice letters are attached as Exhibit A and Exhibit B, respectively, and is incorporated by reference.

COMPLAINT

3.     More than sixty days have passed since notice was served on WIGGINS and the State and federal agencies. Plaintiff is informed and believes, and thereupon alleges, that neither the EPA nor the State of California has commenced or is diligently prosecuting a court action to redress the violations alleged in this complaint. This action's claim for civil penalties is not barred by any prior administrative penalty under Section 309(g) of the Act, 33 U.S.C. § 1319(g).

4.     Venue is proper in the Central District of California pursuant to Section 505(c)(1) of the Act, 33 U.S.C. § 1365(c)(1), because the source of the violations is located within this judicial district.

## II.   **INTRODUCTION**

5.     This complaint seeks relief for discharges of storm water and non-storm water pollutants from WIGGINS' industrial facility located at 2571 Cortez Street in Oxnard, California (hereinafter "Facility") in violation of the Act and National Pollutant Discharge Elimination System ("NPDES") Permit No. CA S000001, State Water Resources Control Board Water Quality Order No. 91-13-DWQ, as amended by Water Quality Order No. 92-12-DWQ, Water Quality Order No. 97-03-DWQ and Order No. 2015-0057-DWQ (hereinafter the "Permit" or "General Permit"). Defendant's failure to comply with the discharge, treatment technology, monitoring requirements, and other procedural and substantive requirements of the Permit and the Act are ongoing and continuous.

6.     With every significant rainfall event millions of gallons of polluted storm

water originating from industrial operations, such as those conducted by Defendant, pour into storm drains and local waterways. The consensus among agencies and water quality specialists is that storm water pollution accounts for more than half of the total pollution entering surface waters each year.

7.     The waterways of Ventura County, including the Santa Clara River and Ventura's coastal waters are ecologically sensitive areas and are essential habitat for dozens of fish and bird species as well as macro-invertebrate and invertebrate species. The waterways provide aesthetic opportunities, such as wildlife observation, and the public uses these waterways for activities such as water contact sports and non-contact recreation.

8.     Industrial facilities, like Defendant's, that are discharging storm water and non-storm water contaminated with sediment, heavy metals, and other pollutants contribute to the impairment of downstream waters and aquatic dependent wildlife and harm the special aesthetic and recreational significance of these waterways, which adversely affect the people in the surrounding communities. These contaminated discharges can and must be controlled for the ecosystem to regain its health.

## III.   **PARTIES**

9.     Founded in 1997, the Wishtoyo Foundation is a 501(c)(3) non-profit public benefit grassroots corporation organized under the laws of the State of California and is located at 11182 Azahar Street, Ventura, CA 93004 and 33904 Pacific Coast Highway, Malibu, California 90265.

COMPLAINT

10.     With over 700 members consisting of Ventura County residents, Chumash Native Americans, and general public who enjoy the Santa Clara River and Ventura County coastal marine waters and environment, the foundation's mission to protect and preserve Chumash culture, the culture of First Nations, and the natural resources all people depend upon.

11.     Ventura Coastkeeper ("Coastkeeper"), a program of Wishtoyo Foundation, is dedicated to the preservation, protection and defense of the ecological integrity and water quality of Ventura County's inland waterbodies, coastal waters, and watersheds. The organization works to achieve this goal through litigation and regulatory programs that ensure water quality protection for all waterways in the county. Coastkeeper is a member of the Waterkeeper Alliance, that has nearly 200 member programs on six continents around the world fighting for clean water.

12.     The unlawful discharge of polluted storm water from WIGGINS negatively affects the water quality of the El Rio Drain, Santa Clara River ("SCR"), the SCR Estuary, and ultimately Ventura's coast and the Pacific Ocean (collectively "Receiving Waters"). Wishtoyo's members live near and/or use the Receiving Waters for domestic and drinking purposes, as well as to fish, boat, swim, surf, bird watch, view wildlife, and to engage in scientific study and cultural activities. The Facility's polluted discharges impair these uses. Thus, the interests Plaintiff's members have been, are being, and will continue to be adversely affected by the Facility's failure to comply with the Clean Water Act and General Industrial Permit. The relief sought

COMPLAINT

5

herein will redress the harms to WISHTOYO caused by Defendant(s)' activities.

13.     Continuing commission of the acts and omissions alleged above will irreparably harm Plaintiff and its members, for which harm they have no plain, speedy or adequate remedy at law.

14.     Plaintiff alleges on information and belief that Defendant WIGGINS is a California corporation that operates the Facility in Oxnard, California.

15.     Upon information and belief, and upon that basis, Plaintiff alleges that the true names, or capacities of DOES 1 through 10, inclusive (the "DOES"), whether individual, corporate, associate or otherwise, are presently unknown to Plaintiff, who therefore sue said Defendants by such fictitious names. Plaintiff will amend this Complaint to show their true names and capacities when the same have been ascertained. Whether or not WIGGINS is associated with any other individual, corporate, associate or otherwise was not immediately apparent through an initial investigation completed by Plaintiff.

16.     WIGGINS and DOES 1 through 10 are referred to collectively throughout this Complaint as Defendant or Defendants.

## IV.     STATUTORY BACKGROUND

### A.     The Clean Water Act.

17.     Section 301(a) of the Act, 33 U.S.C. § 1311(a), prohibits the discharge of any pollutant into waters of the United States unless the discharge complies with various enumerated sections of the statute. Among other things, section 301(a)

COMPLAINT

6

prohibits discharges not authorized by, or in violation of, the terms of NPDES permits issued pursuant to section 402 of the Act, 33 U.S.C. §§ 1311(a) and 1342(b). The Act requires all point source discharges of pollutants to waters of the United States be regulated by an NPDES permit. 33 U.S.C. § 1311(a); *see* 40 C.F.R. § 122.26(c)(1).

18.  "Waters of the United States" are defined as "navigable waters," and "all waters which are currently used, were used in the past, or may be susceptible to use in interstate or foreign commerce, including waters which are subject to the ebb and flow of the tide." 33 U.S.C. § 1362(7); 40 C.F.R. § 122.2.

19.  The EPA promulgated regulations defining "waters of the United States." *See* 40 C.F.R. § 122.2. The EPA interprets waters of the United States to include not only traditionally navigable waters, but also other waters, including waters tributary to navigable waters, wetlands adjacent to navigable waters, and intermittent streams that could affect interstate commerce.

20.  The Act confers jurisdiction over waters that are tributaries to traditionally navigable waters where the water at issue has a significant nexus to the navigable water. *See Rapanos v. United States*, 547 U.S. 715 (2006); *see also N. Cal. River Watch v. City of Healdsburg*, 496 F.3d 993 (9th Cir. 2007).

21.  A significant nexus is established if the water in question "either alone or in combination with similarly situated lands in the region, significantly affect the chemical, physical, and biological integrity of other covered waters." *Rapanos*, 547 U.S. at 780; *N. Cal. River Watch*, 496 F.3d at 999-1000.

COMPLAINT

22.     Section 505(a)(1) of the Act provides for citizen enforcement actions against any "person" who is alleged to be in violation of an "effluent standard or limitation…or an order issued by the Administrator or a State with respect to such a standard or limitation." *See* 33 U.S.C. §§ 1365(a)(1) and 1365(f).

23.     An action for injunctive relief is authorized under section 505(a) of the Act. *See* 33 U.S.C. § 1365(a)(1).

24.     Each separate violation of the Act subjects the violator to a penalty of up to $51,570 per day for violations occurring after November 2, 2015; and up to $37,500 per day per violation for violations occurring prior to and including November 2, 2015.  *See* 33. U.S.C. §§ 1319(d) and 1365(a); 40 C.F.R. § 19.4 (Adjustment of Civil Monetary Penalties for Inflation).

25.     Section 505(d) of the Act allows prevailing or substantially prevailing parties to recover litigation costs, including attorneys' fees, experts' fees, and consultants' fees.  *See* 33 U.S.C. § 1365(d).

**B.      California's Storm Water Permit.**

26.     The State Board is charged with regulating pollutants to protect California's water resources.  *See* Cal. Water Code § 13001.

27.     Section 402(p) of the Act establishes a framework for regulating industrial storm water discharge under the NPDES permit program. 33 U.S.C. § 1342(p).

28.     Section 402(b) of the Act allows each state to administer an EPA-

COMPLAINT

approved NPDES permit program for regulating the discharge of pollutants, including discharges of polluted storm water.  *See* 33 U.S.C. § 1342(b).

29.    States with approved NPDES permit programs are authorized by Section 402(b) to regulate industrial storm water discharges through individual NPDES permits issued to discharge and/or through the issuance of a statewide general NPDES permit applicable to all industrial storm water discharges.  *See* 33 U.S.C. § 1342(b).

30.    California is a state authorized by EPA to issue NPDES permits. The Permit is a statewide general NPDES permit issued by the State Board pursuant to the Act.

31.    Between 1997 and June 30, 2015, the Permit in effect in California was Order No. 97-03-DWQ, which WISHTOYO refers to herein as the "1997 Permit."

32.    On July 1, 2015, California re-issued the Permit pursuant to Order No. 2014-0057-DWQ's NPDES, which is referred to herein as the "2015 Permit."

33.    The 2015 Permit superseded the 1997 Permit, except for enforcement purposes, and its terms are as stringent, or more so, than the terms of the 1997 Permit. *See* 2015 Permit, Findings, ¶ 6.

34.    In order to discharge storm water lawfully in California, industrial dischargers must secure coverage under the Permit and comply with its terms, or obtain and comply with an individual NPDES permit.  1997 Permit, Finding #2; 2015 Permit, Findings, ¶ 12.  Prior to beginning industrial operations, dischargers are required to apply for coverage under the Permit by submitting a NOI to the State

COMPLAINT

Board. 1997 Permit, Finding #3; 2015 Permit, Findings, ¶ 17.

35.     Compliance with the Permit constitutes compliance with the Act for purposes of storm water discharges.  33. U.S.C. §§ 1311(b)(2)(A), 1311(b)(2)(E). Conversely, violations of the Permit are violations of the Act. 1997 Permit, Section C(1); 2015 Permit, Section XXI(A).

**C.     The Permit's Discharge Prohibitions, Effluent Limitations, and Receiving Water Limitations.**

36.     The Permit contains a Discharge Prohibition on the direct or indirect discharge of materials other than storm water ("non-storm water discharges") that is not otherwise authorized by an NPDES permit to waters of the United States. 1997 Permit, Section A(1); 2015 Permit, Section III(B).

37.     The Permit contains an Effluent Limitation that requires permittee facilities to reduce or prevent pollutants in storm water discharges through the implementation of Best Available Technology Economically Achievable ("BAT") for toxic or non-conventional pollutants, and Best Conventional Pollutant Control Technology ("BCT") for conventional pollutants.  40 C.F.R. §§ 401.15-16; 1997 Permit, Section B(3); 2015 Permit, Section V(A).  BAT and BCT include both structural (e.g. installation of advanced filtration and treatment systems, curbs to direct storm water flows, infiltration galleries) and non-structural (e.g. sweeping, and employee education and training) measures.

38.     In order to comply with the statutory BAT/BCT mandate, covered

facilities must implement site-specific structural and non-structural Best Management Practices ("BMPs") designed to prevent or reduce discharges with pollutant concentrations that violate the Permit, and therefore the Act.

39.   EPA's NPDES Storm Water Multi-Sector General Permit for Industrial Activities ("MSGP") include numeric benchmarks for pollutant concentrations in storm water discharges ("EPA Benchmarks") that are numeric thresholds to aid in determining whether a facility discharging industrial storm water had implemented the requisite BAT and/or BCT as mandated by the Act.  *See* United States Environmental Protection Agency NPDES Multi-Sector General Permit for Storm Water Discharges Associated with Industrial Activity, as modified effective May 9, 2009.

40.   EPA's Benchmarks serve as objective measures for evaluating whether the BMPs designed and implemented at a facility achieve the statutory BAT/BCT standards.  *See* MSGP, 80 Fed. Reg. 34,403, 34,405 (June 16, 2015); *see also* MSGP, 73 Fed. Reg. 56,572, 56,574 (Sept. 29, 2008); *see also* MSGP, 65 Fed. Reg. 64,746, 64,766-67 (Oct. 30, 2000).

41.   The State Board established Numeric Action Levels ("NALs") in the 2015 Permit.  *See* 2015 Permit, Section V(A).  NALs are derived from, and function similar to, EPA benchmarks.  *See* 2015 Permit Fact Sheet, Section I(D)(5). Benchmarks and NALs represent pollutant concentrations at which a storm water discharge could impair, or contribute to impairing, water quality and/or affect human health.

COMPLAINT

42.     The Permit also contains various Receiving Water Limitations.  1997 Permit, Receiving Water Limitation C(1)-(2); 2015 Permit, Section VI(A).  Receiving Waters are those surface or other waters to which pollutants are discharged from a given facility.

43.     The first Receiving Water Limitation is that stormwater discharges shall not cause or contribute to an exceedance of any applicable water quality standard ("WQS").  *Id.*

44.     WQS are pollutant concentration levels determined by the State Board, the various regional boards, and the EPA to be protective of the beneficial uses of the water that receive polluted discharges.  WQS applicable to the discharges covered by the Permit include, but are not limited to, those set out in the *Water Quality Control Plan, Los Angeles Basin (Basin Plan for the Coastal Watersheds for Los Angeles and Ventura Counties)*, California Regional Water Quality Control Board, Los Angeles Region 4 (adopted June 13, 1994, as amended) ("Basin Plan") and in the Criteria for Priority Toxic Pollutants for the State of California ("CTR"), 40 C.F.R. § 131.38.

45.     The second Receiving Water Limitation is that storm water discharges shall not adversely impact human health or the environment. 1997 Permit, Receiving Water Limitation C(1); 2015 Permit, Section VI(B).

46.     The third Receiving Water Limitation is that concentrations of pollutants in storm water discharges shall not threaten to cause pollution or a public nuisance. *See* 2015 Permit, Section VI(C).

COMPLAINT

12

47.     The Facility violates the Permit's Receiving Water Limitation when its storm water discharges contain pollutant levels that: i) exceed an applicable WQS; ii) exceed levels known to adversely impact aquatic species and the environment; or iii) threaten to cause pollution.

48.     The Basin Plan identifies the "Beneficial Uses" of the portions of the Receiving Waters that receive polluted storm water discharges from the Facility. These Beneficial Uses include: agriculture supply (AGR), municipal and domestic supply (MUN), groundwater recharge (GWR), water contact recreation (REC1), non-contact water recreation (REC 2), cold freshwater habitat (COLD), warm freshwater habitat (WARM), estuarine habitat (EST), wildlife habitat (WILD), rare, threatened, or endangered species (RARE), migration of aquatic organisms (MIGR) and spawning, reproduction and development (SPWN). See Basin Plan, pp. 2-1 - 2-5. The Basin Plan designates the Santa Clara River ("SCR") surface waters adjacent to and downstream from the Facility as potential municipal and domestic supply (MUN) beneficial uses, and existing agriculture supply (AGR) and groundwater recharge (GWR) beneficial uses. *Id.* Waters designated and used for municipal, domestic, and agricultural supply can be consumed by children, pregnant women, the elderly, and farm workers. See Basin Plan, Table 2-1.

49.     Discharges of pollutants at levels above WQS contribute to the impairment of the beneficial uses of the waters receiving the discharges and constitute violations of the Permit and Act.

COMPLAINT

50.      The Basin Plan also narrative standard, including that inland surface waters "shall not contain suspended or settleable materials in concentrations that cause nuisance or adversely affect beneficial uses."  Basin Plan, 3-37.

51.      The Basin Plan also includes a toxicity standard requiring inland surface waters "be maintained free of toxic substances in concentrations that are toxic to, or that produce detrimental physiological responses in human, plant, animal or aquatic life."  Basin Plan, 3-38.

52.      The CTR includes numeric criteria set to protect human health and the environment in the State of California.[1]

53.      Discharges with pollutant levels in excess of the CTR criteria, the Basin Plan standards, and/or other applicable WQS are violations of the Permit's Receiving Water Limitations.

54.      WQS applicable to the Facility include, but may not be limited to, those detailed in TABLE 1 below.

55.      According to the 2010 303(d) List of Impaired Water Bodies, both the Estuary and Reach One of the SCR are listed as impaired for toxicity. Polluted storm water discharges from the Defendant's Facility may cause and/or contribute to the further impairment of the water quality of the SCR, the Estuary, and the aquatic life that depend on these sensitive ecosystems. To regain the health of the SCR watershed

---

[1] U.S. Envtl. Prot. Agency, Water Quality Standards; Establishment of Numeric Criteria for Priority Toxic Pollutants for the State of California Fact Sheet, EPA 823-00-008 (Apr. 2000) *available at* http://nepis.epa.gov/Exe/ZyPURL.cgi?Dockey=p1007BKN.txt

COMPLAINT

and protect the health of threatened/endangered species, the illegal discharge of contaminated storm water, like those from WIGGINS' Facility, must be eliminated.

**D.     The Permit's Planning and BMP Design Requirements.**

56.     Dischargers must develop and implement a Storm Water Pollution Prevention Plan ("SWPPP") at the time industrial activities begin. 1997 Permit, Sections A(1)(a) and E(2); 2015 Permit, Sections I(I) (Finding 54) and X(B).

57.     The SWPPP must identify and evaluate sources of pollution associated with industrial activities that may affect the quality of stormwater and authorized non-stormwater discharges from the facility.  1997 Permit, Section A(2); 2015 Permit, Section X(G).

58.     The SWPPP must identify and describe site-specific BMPs to reduce or prevent pollutants associated with industrial activity in storm water and authorized non-stormwater discharges. 1997 Permit, Section A(2); 2015 Permit, Section X(H). The SWPPP must also include BMPs that achieve pollutant discharge reductions attainable via BAT and BCT. 1997 Permit, Order Section A(2); 2015 Permit, Section I(D) (Finding 32), Section X(C).

59.     The SWPPP must include: i) a narrative description and summary of all industrial activity, potential sources of pollution, and potential pollutants; ii) a site map indicating the storm water conveyance system, associated points of discharge, direction of flow, areas of actual and potential pollutant contact, including the extent of pollution-generating activities, nearby water bodies, and pollutant control

COMPLAINT

measures; iii) a description of storm water management practices; iv) a description of the BMPs to be implemented to reduce or prevent pollutants in storm water discharges and authorized non-storm water discharges; v) the identification and elimination of non-storm water discharges; vi) identify and locate where materials are being shipped, received, stored, handled, as well as typical quantities of such materials and the frequency with which they are handled; vii) a description of dust and particulate generating activities; and viii) a description of individuals and their current responsibility for developing and implementing the SWPPP. 1997 Permit, Section A(1)-(10); 2015 Permit, Section X.

60.     The 2015 Permit further requires certain SWPPP enhancements, including a more comprehensive assessment of potential pollutant sources and more specific BMP descriptions.  *See* 2015 Permit Sections X(G)(2), (4), (5).

61.     The objectives of the SWPPP are to identify and evaluate the source of pollutants associated with industrial activities that may affect the quality of storm water discharges, to identify, design and implement site-specific BMPs to prevent the exposure of pollutants to storm water, and to reduce or prevent the discharge of polluted storm water from industrial facilities.  1997 Permit, Section A(2); 2015 Permit, Section X.

62.     The objectives of the requirement to develop, maintain and revise a SWPPP are to identify pollutant sources and develop BMPs that reduce or prevent polluted storm water from negatively affecting Receiving Waters and California

communities.  *See* 1997 Permit Section A(2); *see also* 2015 Permit Section X(C).

BMPs must achieve compliance with the Permit's Effluent Limitations and Receiving

Water Limitations.  To ensure compliance, the SWPPP must be evaluated and revised

as necessary.  *See* 1997 Permit Sections A(9)-(10); *see also* 2015 Permit § X(B).

Failure to develop or implement an adequate SWPPP (or revise an existing SWPPP,

as necessary) constitutes an independent Permit violation.  *See* 2015 Permit, Fact

Sheet, Section I(1).

63.     The Permit also requires that the discharger conduct an annual

comprehensive site compliance evaluation that includes a review of all visual

observation records, inspection reports and sampling analysis data, a visual inspection

of all potential pollutant sources for evidence of, or the potential for, pollutants

entering the drainage system, a review and evaluation of all BMPs to determine

whether the BMPs are adequate, properly implemented and/or maintained, or whether

additional BMPs are needed, and a visual inspection of equipment needed to

implement the SWPPP.  1997 Permit, Sections A(9)(a)-(c); 2015 Permit, Section XV.

64.     Section A(9)(d) of the 1997 Permit requires that the discharger submit an

evaluation report that includes an identification or personnel performing the

evaluation, date(s) of the evaluation(s) necessary SWPPP revisions, a schedule for

implementing SWPPP revisions, any incidents of non-compliance and the corrective

actions taken, and a certification that the discharger is in compliance with the Permit.

1997 Permit; Section A(9)(d)(i)-(vi).  If certification cannot be provided, the

COMPLAINT

discharger must explain in the evaluation report why the facility is not in compliance. *Id.*, Section A(9)(d). The evaluation report shall be submitted as part of the Annual Report specified in Section B(14) of the Permit. *Id.*

### E.     The Permit's Monitoring and Reporting Requirements

65.      The 1997 Permit required facility operators to develop and implement a monitoring and reporting program ("M&RP") when industrial activities begin at the facility. 1997 Permit, Sections B(1)-(2) and E(3). The 2015 Permit also requires implementation of an M&RP. 2015 Permit, Sections X(I) and XI.

66.      The objectives of the M&RP are to inform discharges about the effectiveness of BMPs designed in the planning phase and implemented on the ground. Where the M&RP indicates that BMPs are not adequate to prevent or reduce pollutants in storm water discharges, permittees have an obligation to re-design BMPs and/or improve BMP implementation as necessary to ensure that storm water discharges are in compliance with the Permit's Discharge Prohibitions, Effluent Limitations and Receiving Water Limitations. *See* 1997 Permit, Section B(2); *see also* 2015 Permit, Sections X(I) and XI.

67.      The 2015 Permit requires facility operators to visually observe, monitor and sample storm water discharges to ensure that the facility is complying with its obligations under the Permit. 2015 Permit, Sections I(J) (Findings 55-56) and XI.

68.      The M&RP must be revised as necessary to ensure Permit compliance. 1997 Permit, Section B(2)(d); 2015 Permit, Section XI(A)(4).

69.     Discharges must conduct monthly visual observations of storm water discharges as part of a legally adequate M&RP.  1997 Permit, Section B(4)(a); 2015 Permit, Section XI(A).

70.     Dischargers must observe and document the presence of any floating and suspended materials, oil and grease, discolorations, turbidity, or odor in a discharge, and the source of any pollutants in storm water discharges from the facility.

71.     Dischargers are required to maintain detailed records of each observation, and corrective action taken to reduce or prevent pollutant from contacting storm water discharges.  *See* 1997 Permit, Section B(4)(c); *see also* 2015 Permit, Section XI(A)(3).

72.     The Permit requires dischargers to revise the SWPPP as necessary to ensure that BMPs are effectively reducing and/or eliminating pollutants from entering surface waters from the facility.  1997 Permit, Section B(4)(c), 2015 Permit, Section XI(B)(1).

73.     The Permit requires dischargers to visually observe and collect samples of storm water discharges from each location where storm water is discharged.  1997 Permit, Sections B(5) and B(7); 2015 Permit, Section XI(B)(4).

74.     Section B(5)(a) of the 1997 Permit required dischargers to collect storm water samples during the first hour of discharge from the first storm event of the Wet Season and at least one other storm event in the Wet Season. All storm water discharge locations must be sampled. Facility operators that do not collect samples

COMPLAINT

from the first storm event of the Wet Season are still required to collect samples from two other storm events of the Wet Season and must explain in the Annual Report why the first storm event was not sampled.

75.     Section B(5)(b) required that sampling conducted pursuant to the 1997 Permit occur during scheduled facility operating hours that are preceded by at least three (3) working days without storm water discharge.

76.     Section XI(B)(1) of the 2015 Permit requires sampling from a Qualifying Storm Event ("QSE"), which is a precipitation event that produces a discharge for at least one drainage area and is preceded by forty-eight (48) hours with no discharge from any drainage area.

77.     Dischargers are required to collect samples of storm water within 4 hours of the start of facility operations if the QSE began within the previous 12-hour period, e.g. for storms with discharges that begin during the night for facilities with day-time operations. 2015 Permit, Section XI(B)(5)(b).

78.     Section XI(B)(2) of the 2015 Permit requires dischargers to collect and analyze storm water samples from two (2) QSEs within the first half of each reporting year (July 1 to December 31), and two (2) QSEs within the second half of each reporting year (January 1 to June 30).

79.     Section XI(B)(11) of the 2015 Permit, among other requirements, provides that permittees must submit all sampling and analytical results for all samples via SMARTS within thirty (30) days of obtaining all results for each

1    sampling event.

2        80.    The Permit requires all dischargers, regardless of the type of industrial

3    operation, to analyze each sample for pH, specific conductance ("SC"), TSS, and

4

5    either total organic carbon ("TOC") or Oil & Grease ("O&G").  1997 Permit, Section

6    B(5)(c)(i); 2015 Permit, Sections XI(B)(6)(a)-(b). Depending upon the type of

7    industrial operation, the Permit may require a discharger to analyze each sample for

8

9    additional constituents, such as copper, lead, aluminum, iron, and or zinc for

10   example.

11

12   V.    **STATEMENT OF FACTS**

13       A.    **The Facility**

14

15       81.    Upon information and belief, WIGGINS first enrolled on September 11,

16   2002 for coverage under the 1997 Permit ("NOI 1997"); and then on June 26, 2015

17   obtained coverage under the 2015 Permit ("NOI 2015"). The Waste Discharge

18

19   Identification ("WDID") number for the WIGGINS Facility is 4 56I017490.[2] The

20   Primary SIC code is 3537 (Industrial Trucks, Tractors, Trailers, and Stackers).

21       82.    The Facility is approximately 3.7 acres and consists of a single large

22

23   assembly/office building, an attached storage building, several outdoor areas (some

24   covered overhead) used for parking, loading/unloading, material storage, as well as

25

26   certain industrial operations. Materials stored outside including metal plate stock and

27   various gas and oil supplies.

28

---

[2] Previously filed under WDID # 4 56S017490.
COMPLAINT

83.     According to the Facility's 2015 SWPPP, WIGGINS fabricates fork lift trucks, which includes metal cutting, fabrication, assembly, painting, and inspection services. Equipment at the Facility includes small forklifts, overhead crane, flame cutting tools, welders with various gas mixtures, air powered hand held grinders, and paint spray equipment. Activities at the site that are significant to storm water management include the use and storage of hazardous substances and chemicals such as the following: gases (e.g. propane, acetylene, carbon dioxide); drums and tanks containing liquid oils (e.g. hydraulic, motor, gear and waste oil); and other liquid materials (e.g. diesel, waste coolant, ethylene glycol, gasoline, coolant, and degreaser). The abovementioned activities act as a potential source of pollution of contaminated water, oil, grease, hydrocarbons, and metal ions. Other sources of pollution at the Facility include paint particulates from paint activities and rubber solids from tires used and/or stored on site.

84.     Also indicated in the 2015 SWPPP, storm water discharges from the Facility at one point at the northeast corner of the property into a local storm drain system (El Rio Drain) which discharges directly into Reach 1 of the SCR approximately 7,000 feet from the Facility. From there, water flows into the SCR Estuary, SCR Estuary Beach-Surfers Knoll, McGrath Beach, and disperses across the Ventura coastline. Storm water from the Wiggins Facility drains to SCR Reach 1, which is approximately 7,000 feet southeast of the Facility. *See* 2015 SWPPP, p. 9. First, surface water flows to the northeast corner of the Facility and drains into the

COMPLAINT

storm drain system known. *Id.*; *see also* SWPPP Wiggins Site Plan Attachment. Next, as indicated by maps maintained by the County of Ventura[3] and the State Board,[4] water is transported southwest to the SCR Reach 1 via the El Rio Drain owned by the City of Oxnard and monitored by the Ventura Countywide Storm water Quality Management Program.[5] From the SCR Reach 1 (Hwy 101 to SCR Estuary), water flows into the SCR Estuary, SCR Estuary Beach-Surfers Knoll, McGrath Beach, and disperses across the Ventura coastline.

85.     On information and belief, Plaintiff alleges that the management practices at the Facility do not prevent the sources of contamination described above from causing the discharge of pollutants to waters of the United States. Of particular concern to WISHTOYO are i) exceedances and violations of effluent and receiving water limitations, ii) inadequate monitoring and reporting program, iii) failure to file accurate and timely sample reports, and iv) failure to implement an adequate SWPPP.

86.     On information and belief, Plaintiff alleges that the Facility has failed and continues to fail to reduce or prevent pollutants associated with industrial activity in storm water discharges through implementation of BMPs that achieve BAT/BCT as required by the Act and Permit.

---

[3] See Ventura Countywide Unified Storm Drain Map data, available at http://vcstormwater.org/index.php/publications/maps/ventura-countywide-unified-storm-drain-map (last visited Jan. 5, 2016).
[4] See Los Angeles Region Integrated Report Clean Water Act Section 305(b) Report and Section 303(d) List of Impaired Waters, Appendix F, "20010 Clean Water Act 303(d) List of Water Quality Limited Sections," available at http://www.waterboards.ca.gov/water_issues/programs/tmdl/integrated2010.shtml (last visited 5 Jan. 2016).
[5] Water flows southerly along Cortez Street past the Ventura freeway (101 fwy.), then west across Vineyard Avenue (State Route 232), northwest along Oxnard Boulevard (Pacific Coast Highway 1), west adjacent to nearby railroad tracks, south down Ventura Road, and jettisons west into the SCR

COMPLAINT

**B.    The Receiving Waters**

87.    Flowing approximately 116 miles from the headwaters of the San Gabriel Mountains to the Pacific Ocean through a 1,600 square mile watershed, the Santa Clara River is southern California's last naturally flowing major river system. In addition to being the largest wild river remaining in southern California, the Santa Clara River provides crucial aquatic ecosystem functions in the region, including groundwater recharge and riparian habitat for endangered and rare species. It is home to as many as 17 species listed as threatened or endangered by state and federal governments, and includes critical habitat for many species including the endangered Southern California Steelhead, Santa Ana Sucker, Tidewater Goby, Unarmored Threespine Stickleback, Pacific Lamprey, California Red-Legged Frog, Arroyo Toad, Southwestern Willow Flycatcher, Western Yellow Billed Cuckoo, and Least Bell's Vireo. The Santa Clara River is also a significant input to southern California's coastal waters at the Cities of San Buenaventura and Oxnard, and a healthy, unpolluted Santa Clara River from Santa Clarita through Piru, Fillmore, Santa Paula, Saticoy, El Rio, Ventura, and Oxnard provides unmatched recreational, cultural, aesthetic, and spiritual opportunities and resources in the region. In addition, the ecosystem services provided by the Santa Clara River, as recognized by the Basin Plan include agriculture supply, groundwater recharge, freshwater replenishment, recreation, cold and warm freshwater habitat, wildlife habitat for rare, threatened, or endangered species, wetland habitat, estuarine habitat, and migration, spawning,

COMPLAINT

reproduction and development habitat for aquatic organisms. Thus, it is imperative that Santa Clara River's water quality, aesthetic values, and aquatic ecosystem functions are adequately protected. In 2005, the Santa Clara River was named the "10th Most Endangered River" in the Country by the American Rivers organization due to anthropogenic impacts, such as pollution

88.     Discharges of polluted storm water and non-storm water to the Receiving Waters pose carcinogenic, developmental and reproductive toxicity threats to the public, and adversely affect the aquatic environment, and contribute the degradation of these already impaired waters, beaches, and recreational and wildlife resources, including the Santa Clara River's native and endangered species.  For example, both the Estuary and Reach 1 of the SCR are listed as impaired for toxicity.[6] Polluted storm water discharged from the Wiggins Facility may cause and/or contribute to the impairment of water quality in the SCR, its watershed and the Estuary, and is acutely toxic to, and has sub-lethal toxicity impacts on, the Southern California Steelhead and other aquatic life in the SCR and its estuary.

**C.     Defendant's Specific Violations of Water Quality Standards Including Effluent Limitations, Receiving Water Limitations and Protections for Impaired Water Bodies**

89.     **Effluent Limitations**.  Since at least February 06, 2014, WIGGINS has taken samples or arranged for samples to be taken of storm water discharges at the

---

[6] See Los Angeles Region Integrated Report Clean Water Act Section 305(b) Report and Section 303(d) List of Impaired Waters, Appendix F, "20010 Clean Water Act 303(d) List of Water Quality Limited Sections," available at http://www.waterboards.ca.gov/water_issues/programs/tmdl/integrated2010.shtml (last visited 5 Jan. 2016).
COMPLAINT

Facility. The sample results were reported in the Facility's annual reports submitted to the Regional Board. WIGGINS certified each of those annual reports pursuant to Sections A and C of the General Permit.

90.     According to information available to WISHTOYO, including a thorough review of both electronic and hard copy files held by the State Board, the Facility has been in continuous violation of the Permit's Effluent Limitations for the entirety of the relevant statute of limitations, at least with respect to total suspended solids (TSS), aluminum (Al), copper (Cu), iron (Fe) and zinc (Zn); as well as violations of other parameters such as lead (Pb), magnesium (Mg), and for potential of hydrogen (pH) levels. This pattern of exceedances of EPA benchmark and applicable NAL values confirms the Defendant's consistent failure to implement adequate BMPs and its ongoing violation of the Permit and the Act.

91.     The data available to WISHTOYO, as reported to the Regional Board by WIGGINS, relevant to the Facility's violations of the Permit's Effluent Limitation are summarized below at Table 1. Self-monitoring reports under the Permit are deemed "conclusive evidence of an exceedance of a permit limitation." *Sierra Club v Union Oil*, 813 F.2d 1480, 1493 (9th Cir. 1988).

/ / /

# TABLE 1

## SAMPLING DATA DEMONSTRATES ONGOING EXCEEDANCES OF EFFLUENT LIMITATIONS FOR MULTIPLE POLLUTANTS

| LINE | DATE | TSS | AL | FE | ZN | CU | PB | MG |
|------|------|-----|-----|-----|-----|-----|-----|-----|
| EPA BENCHMARK | | 100 | 0.75 | 1.0 | 0.117 | 0.0322 | 0.262 | 0.064 |
| APPLICABLE NAL | | 100 annual / 400 instant | 0.75 | 1.0 | 0.26 | 0.0322 | 0.262 | 0.064 |
| | UNITS | MG/L | MG/L | MG/L | MG/L | MG/L | MG/L | MG/L |
| 1 | 02/06/14 | 83 | 2.40* | 2.90* | 1.0* | 0.043* | 0.045 | 0.15* |
| 2 | 12/02/14 | 110* | NT | NT | NT | NT | NT | NT |
| 3 | 09/15/15[A] | 340* | 6.10* | 14.00* | 2.50* | NT | 0.240 | NT |
| 4 | 01/05/16 | 170* | 4.70* | 9.90* | 0.99* | NT | 0.160 | NT |
| 5 | 03/07/16[B] | 360* | 7.10* | 17.0* | 2.20* | NT | 0.170 | NT |
| 6 | 03/11/16 | 950* | 13.0* | 17.0* | 4.30* | NT | 0.460* | NT |
| 7 | 10/28/16[C] | 240* | 3.7* | 4.9* | 2.0* | NT | 0.11 | NT |
| 8 | 01/04/17 | 155* | 3.3* | 3.6* | 1.0* | NT | 0.12 | NT |

\*   *Indicating exceedance of applicable effluent limitations.*

NT   *Not tested by WIGGINS.*

A   *Sample untimely reported on December 13, 2016.*

B   *Invalid Qualified Storm Event since Facility likely experienced discharge within proceeding 48 hours on Mar. 5 (0.23 in.) and Mar. 6 (0.86 in.). See Storm Event Summary attached to Jan. 17 and Feb. 7 notice letters (Exhibits A and B).*

C   *Sample untimely reported and included pH level of 5, outside EPA Benchmark and applicable NAL range of 6.0 – 9.0.*

92.     The results of storm water sample analyses between February 2014 and January 2017 (as summarized in lines one (1) through eight (8) of Table 1) show consistent exceedances of benchmark/NAL levels for TSS, Al, Cu, Fe, and Zn. In some cases, data indicates exceedances of 9x above parameters for total suspended

COMPLAINT

solids, 17x for aluminum, 17x for iron, and 36x for zinc. See Table 1, line 6.

Information available to WISHTOYO, including the sampling data summarized above, demonstrates that the Facility has and continues to fail to develop or implement BMPs that achieve compliance with the Act's BAT/BCT mandates.

93.     **Primary Receiving Water Limitations.**  Receiving Water Limitation C(2) prohibits storm water discharges and authorized non-storm water discharges that cause or contribute to an exceedance of an applicable WQS.[7] The 1997 and 2015 Storm Water Permit includes the same receiving water limitation. See 2015 Permit, Receiving Water Limitation VI.A. Samples of storm water discharged from the WIGGINS Facility have demonstrated exceedances of the Basin Plan's water quality standards for numerous pollutants (see Table 1). These discharges that contain pollutants in excess of an applicable water quality standard violate Receiving Water Limitation C(2) of the Storm Water Permit and the Clean Water Act, including the EPA's CTR at  40 C.F.R. § 131.38. *Santa Monica Baykeeper v. Kramer Metals, Inc.* 619 F.Supp.2d 914 (C.D. Cal 2009).  For instance, the Basin Plan set the limit for Aluminum at 1 mg/L for MUN uses, which is applicable to SCR Reach 1 which the Facility discharges to.  Thus, any and all exceedance of a 1 mg/L discharge for Aluminum is a separate and distinct violation of the Permit's Receiving Water

---

[7] The Basin Plan designates Beneficial Uses for the Receiving Waters. Water quality standards are pollutant concentration levels determined by the state or federal agencies to be protective of designated Beneficial Uses. Discharges above water quality standards contribute to impairment of Receiving Waters' Beneficial Uses. Applicable water quality standards include, among others, the CTR, and water quality objectives in the Basin Plan.

COMPLAINT

1   Limitations.

2   94.   **Secondary Receiving Water Limitations**.  Receiving Water Limitation

3   C(1) of the 1997 General Storm Water Permit prohibits storm water discharges and
4

5   authorized non- storm water discharges to surface water that adversely impact human

6   health or the environment. Storm Water Permit, Receiving Water Limitation C(1).

7
8   The 2015 Permit includes the same receiving water limitation. See 2015 Permit,

9   Receiving Water Limitation VI. B.  Discharges that contain pollutants in

10  concentrations that exceed levels known to adversely impact aquatic species and the
11

12  environment constitute violations of Receiving Water Limitation C(1) of the 2015

13  Storm Water Permit, and the Clean Water Act. Discharges of toxic metals such as

14  iron, aluminum, copper, lead, and zinc from the Facility into Receiving Waters cause
15

16  or contribute to: acute and chronic toxicity and sublethal toxicity impacts to aquatic

17  life and aquatic plants; change in the diversity and abundance of aquatic life; change
18

19  in aquatic community structure and function; impacts to metabolism and

20  osmoregulation of aquatic life; change in the structure and quality on benthic

21  invertebrate habitat and food resources leading to decline in benthic invertebrate
22

23  populations and diversity; and increases in aquatic organisms dietary supply of metals

24  that can result in toxicity effects that ripple through an ecosystem's food chain.  Both
25

26  the Estuary and Reach 1 of the SCR to which Wiggins discharges are listed as

27

28

COMPLAINT

impaired for toxicity.[8]   Polluted storm water discharged from the Wiggins Facility causes and/or contributes to the impairment of water quality in the SCR, SCR Estuary, and the SCR watershed which is acutely toxic to, and have sub-lethal impacts on, the Southern California Steelhead and other aquatic life in the SCR and the SCR Estuary. Therefore, the stormwater discharges from the Facility adversely impact human health and the environment in violation of Receiving Water Limitation C(1) of the 1997 Storm Water Permit, Receiving Water Limitation VI.B of the 2015 Permit, and the Clean Water Act.

95.     For the Santa Clara River watershed aquatic ecosystem to regain its health, and for the Santa Clara River watershed's threatened and endangered species to recover and thrive, contaminated storm water discharges like those from the Facility must be eliminated.

**D.     SWPPP and Monitoring Violations**

96.     On information and belief, Plaintiff alleges that every year during the relevant statutory period, WIGGINS has failed to collect the required amount of samples for the first half (July through December) and two samples for the second half (January through June) and include them in a compliant annual report, despite the opportunity to do so.  For example, the Facility collected no samples in the second half of the 2011-2012 reporting year despite the opportunity to sample four QSEs

---

[8] See Los Angeles Region Integrated Report Clean Water Act Section 305(b) Report and Section 303(d) List of Impaired Waters, Appendix F, "20010 Clean Water Act 303(d) List of Water Quality Limited Sections," available at http://www.waterboards.ca.gov/water_issues/programs/tmdl/integrated2010.shtml (last visited 5 Jan. 2016).

COMPLAINT

(storm events of at least 0.1 inches, during non-holiday, workdays with no rainfall in the preceding 48 hours). See Storm Event Summary attached to January 17, 2017 and February 7, 2017 notice letters (Exhibits A and B).  Similar failures to collect adequate samples occurred during the following periods: the entire 2012-2013 year (despite seven QSEs), first half of 2013-2014 year (despite two QSEs), second half of 2013-2014 year (four QSEs), only one sample during first half of 2015-2016 year (three QSEs), and only one sample taken during the first half of 2016-2017 year (two QSEs).

97.     Plaintiff is informed and believes that since at least 2012, Defendant consistently failed to test for all necessary parameters. For example, the only sample taken during the 2014-2015 reporting year (Dec. 2, 2014) did not show the results for aluminum, iron, zinc, copper, or lead—thus preventing any comparison against benchmarks for exceedances. See Table 1, line 2. Additionally, after reporting copper and magnesium levels above benchmark/NAL values, WIGGINS failed to test for either parameter in any of its subsequent samples. Nor did the Facility ever test for total recoverable petroleum hydrocarbons, despite being lists in its 2015 SWPPP as a constituent for which to sample.

98.     On information and belief, Plaintiff alleges that Defendant violated monitoring and reporting requirements through various improper and misleading practices during the statutory period.   For example, nearly half of all samples taken were either untimely submitted to the Waterboard or taken from an invalid QSE. See

Table 1, lines 3, 5, and 7.  There was a one-year delay in reporting the September 15, 2015 (*id.* at lines 3) sample, which WIGGINS reported aluminum levels at 2.5 mg/L when lab results showed levels at 6.1 mg/L.

99.    Plaintiff alleges that since at least March 21, 2012, WIGGINS did not submit compliant annual reports, that were signed and certified by the appropriate corporate officer, outlining the Facility's storm water controls and accurately certifying compliance with the General Permit.  Defendant has failed and continues to fail to submit Annual Reports that comply with these reporting requirements. For example, in each annual report since the filing of the 2011-2012 reporting year, WIGGINS certified that: (i) a complete Annual Comprehensive Site Compliance Evaluation was done pursuant to Section A(9) of the Storm Water Permit; (ii) the SWPPP's BMPs address existing potential pollutant sources and additional BMPs are not needed; and (iii) the SWPPP complies with the General Industrial Permit, or will otherwise be revised to achieve compliance. However, information available to WISHTOYO indicates that these certifications are erroneous. For example, as discussed above, samples collected from the Facility contain concentrations of pollutants above EPA benchmarks, applicable NALs, and established WQS levels and therefore demonstrate that the SWPPP's BMPs do not adequately address existing potential pollutant sources. Additionally, at the time that the Annual Report is submitted, the facility operator must report any noncompliance with the Storm Water Permit in sufficient detail, including i) a description of the noncompliance and its

COMPLAINT

cause, ii) the period of noncompliance, iii) when noncompliance was resolved or anticipated to be resolved, and iv) steps taken or planned to reduce and prevent recurrence of the noncompliance. See 1997 Permit, § C(11)(d). WIGGINS has failed, and continues to fail, to report non-compliance as required.

100.    On information and belief, Plaintiff alleges that during the statutory period, Defendant did not implement an adequate SWPPP for the Facility. The 2015 SWPPP describes only minimum BMPs for the Facility and was minimally modified in December 2016 by adding two sentences regarding advance BMPs. The SWPPP has not been regularly revised or updated in response to data collected since March 21, 2012.

101.    Plaintiff alleges that the abovementioned sampling, monitoring, and reporting errors indicates that WIGGINS has submitted incomplete and/or incorrect annual reports that fail to comply with the General Industrial Permit. As such, Defendant is in daily violation of the Permit, and every day the Facility operates without reporting as required by the Permit is a separate and distinct violation of the Permit and Section 301(a) of the Act. 33 U.S.C. §1311(a). WIGGINS has been in daily and continuous violation of the Permit's reporting requirements every day since at least March 21, 2012. These violations are ongoing. WISHTOYO will include additional violations when information becomes available, including specific violations of the 2015 Permit reporting requirements. See 2015 Permit, §§ XII, XVI.

102.    Information available to Plaintiff indicates that Defendant has not

fulfilled the requirements set forth in the General Permit for discharges from the Facility due to the continued discharge of contaminated storm water. Plaintiff alleges that during the statutory period, Defendant has not implemented BAT and BCT at the Facility for discharges of TSS, Fe, Al, Cu, Zn and other pollutants. As of the date of this Complaint, the Facility has not implemented adequate BAT and BCT.

103.   Plaintiff is informed and believes, and thereupon alleges, that all of the violations alleged in this Complaint are ongoing and continuing.

## CLAIMS FOR RELIEF

### FIRST CAUSE OF ACTION
**Defendant's Discharges of Contaminated Storm Water in Violation of Permit Effluent Limitations and the Act
(33.S.C. §§ 1311, 1342, 1365(a), and 1365(f))**

104.   Plaintiff re-alleges and incorporate all of the preceding paragraphs as if fully set forth herein.

105.   WISHTOYO is informed and believes, and thereon alleges, that Defendant failed and continues to fail to reduce or prevent pollutants associated with industrial activities at the Facility from discharging from the Facility through implementation of BMPs that achieve BAT/BCT.

106.   WISHTOYO is informed and believes, and thereon alleges, that discharges of storm water containing levels of pollutants that do not achieve compliance with BAT/BCT standards from the Facility occur every time storm water discharges from the Facility.  Defendant's failure to develop and/or implement BMPs

COMPLAINT

that achieve the pollutant discharge reductions attainable via BAT/ BCT at the Facility is a violation of the Storm Water Permit and the Act. *See* 1997 Permit, Effluent Limitation B(3); *see also* 2015 Permit, Section I(D) (Finding 32), Section V(A); *see also* 33 U.S.C. § 1311(b).

107.   Defendant violates and will continue to violate the Permit's Effluent Limitations each and every time storm water containing levels of pollutants that do not achieve BAT/BCT standards discharges from the Facility.

108.   Each and every violation of the Permit's Effluent limitations is a separate and distinct violation of Section 301(a) of the Act, 33 U.S.C. § 1311(a).

109.   Defendant's violations of the Permit's Effluent Limitations and the Act are ongoing and continuous.

110.   By committing the acts and omissions alleged above, WIGGINS is subject to an assessment of civil penalties for each and every violation of the Act occurring from March 21, 2012 to the present, pursuant to sections 309(d) and 505 of the Act, 33 U.S.C. §§ 1319(d), 1365, and 40 C.F.R. § 19.4.

111.   An action for injunctive relief is authorized by Act section 505(a), 33 U.S.C. § 1365(a). Continuing commission of the acts and omissions alleged above would irreparably harm Plaintiff and the citizens of the State of California, for which harm WISHTOYO has no plain, speedy, or adequate remedy at law.

112.   An action for declaratory relief is authorized by 28 U.S.C. § 2201(a) because an actual controversy exists as to the rights and other legal relations of the

COMPLAINT

1  Parties.

2        WHEREFORE, Plaintiff prays for judgment against Defendant as set forth

3

4  hereafter.

5                        **SECOND CAUSE OF ACTION**
          **Defendant's Discharges of Contaminated Storm Water in Violation**
6            **of the Permit's Receiving Water Limitations and the Act**
                      **(33.S.C. §§ 1311(a), 1342, 1365(a), and 1365(f))**
7

8       113.   Plaintiff re-alleges and incorporate all of the preceding paragraphs as if

9  fully set forth herein.

10       114. WISHTOYO is informed and believes, and thereon alleges, that

11

12  discharges of storm water containing levels of pollutants that adversely impact

13  human health and/or the environment from the Facility occur each time storm water

14  discharges from the Facility.

15

16       115. WISHTOYO is informed and believes, and thereon alleges, that storm

17  water containing levels of pollutants that cause or contribute to exceedances of water

18

19  quality standards has discharged and continues to discharge from the Facility each

20  time stormwater discharges from the Facility.

21       116. Plaintiff is informed and believes, and thereupon alleges, that since at least

22

23  March 21, 2012, Defendant has discharged polluted storm water from the Facility

24  causing or contributing to the violation of the applicable WQS and that adversely

25  impact human health or the environment in violation of the Receiving Water

26

27  Limitation of the General Permit.

28       117. Every day, since at least March 21, 2012, that Defendant has discharged

COMPLAINT
                                    36

discharge polluted storm water from the Facility in violation of the General Permit is a separate and distinct violation of Section 301(a) of the Act, 33 U.S.C. § 1311(a). These violations are ongoing and continuous.

118.  Each and every violation of the Storm Water Permit Receiving Water Limitations is a separate and distinct violation of section 301(a) of the Act, 33 U.S.C. § 1311(a).

119.  By committing the acts and omissions alleged above, WIGGINS is subject to an assessment of civil penalties for each and every violation of the Act occurring from March 21, 2012 to the present, pursuant to sections 309(d) and 505 of the Act, 33 U.S.C. §§ 1319(d), 1365, and 40 C.F.R. § 19.4.

120.  An action for injunctive relief is authorized by Act section 505(a), 33 U.S.C. § 1365(a). Continuing commission of the acts and omissions alleged above would irreparably harm Plaintiff and the citizens of the State of California, for which WISHTOYO has no plain, speedy, or adequate remedy at law.

121.  An action for declaratory relief is authorized by 28 U.S.C. § 2201(a) because an actual controversy exists as to the rights and other legal relations of the Parties.

WHEREFORE, Plaintiff prays for judgment against Defendant as set forth hereafter.

COMPLAINT

## THIRD CAUSE OF ACTION
### Defendant's Failure to Prepare, Implement, Review, and Update an Adequate Storm Water Pollution Prevention Plan
### (Violations of Permit Conditions and the Act, 33 U.S.C. §§ 1311, 1342)

122. Plaintiff re-alleges and incorporates all of the preceding paragraphs as if fully set forth herein.

123. Defendant has not developed and implemented an adequate SWPPP for the Facility.

124. Each day since March 21, 2012, that Defendant does not develop, implement and update an adequate SWPPP for the Facility is a separate and distinct violation of the General Permit and Section 301(a) of the Act, 33 U.S.C. § 1311(a).

125. Defendant has been in violation of the SWPPP requirements every day since March 21, 2012. Violation continues each day that an adequate SWPPP for the Facility is not developed and fully implemented.

126. By committing the acts and omissions alleged above, WIGGINS is subject to an assessment of civil penalties for each and every violation of the Act occurring from March 21, 2012 to the present, pursuant to sections 309(d) and 505 of the Act, 33 U.S.C. §§ 1319(d), 1365, and 40 C.F.R. § 19.4.

127. An action for injunctive relief is authorized by Act section 505(a), 33 U.S.C. § 1365(a). Continuing commission of the acts and omissions alleged above would irreparably harm Plaintiff and the citizens of the State of California, for which harm WISHTOYO has no plain, speedy, or adequate remedy at law.

128. An action for declaratory relief is authorized by 28 U.S.C. § 2201(a)

COMPLAINT

because an actual controversy exists as to the rights and other legal relations of the Parties.

WHEREFORE, Plaintiff prays for judgment against Defendant as set forth hereafter.

### FOURTH CAUSE OF ACTION
**Defendant's Failure to Develop and Implement an
Adequate Monitoring and Reporting Program
(Violation of Permit Conditions and the Act, 33 U.S.C. §§ 1311, 1342)**

129.  Plaintiff re-alleges and incorporates all of the preceding paragraphs as if fully set forth herein.

130.  Defendant has not developed and implemented an adequate monitoring and reporting program for the Facility.

131.  Each day since March 21, 2012, that Defendant did not develop and implement an adequate monitoring and reporting program for the Facility in violation of the General Permit is a separate and distinct violation of the General Permit and Section 301(a) of the Act, 33 U.S.C. § 1311(a).  The absence of requisite monitoring and analytical results are ongoing and continuous.

132.  By committing the acts and omissions alleged above, WIGGINS is subject to an assessment of civil penalties for each and every violation of the Act occurring from March 21, 2012 to the present, pursuant to sections 309(d) and 505 of the Act, 33 U.S.C. §§ 1319(d), 1365, and 40 C.F.R. § 19.4.

133.  An action for injunctive relief is authorized by Act section 505(a), 33 U.S.C. § 1365(a). Continuing commission of the acts and omissions alleged above

would irreparably harm Plaintiff and the citizens of the State of California, for which harm WISHTOYO has no plain, speedy, or adequate remedy at law.

134. An action for declaratory relief is authorized by 28 U.S.C. § 2201(a) because an actual controversy exists as to the rights and other legal relations of the Parties.

WHEREFORE, Plaintiff prays for judgment against Defendant as set forth hereafter.

## FIFTH CAUSE OF ACTION
**Defendant's Failure to Accurately Certify Compliance in Annual Reports in Violation of the Permit and the Act**
**(33.S.C. §§ 1311, 1342, 1365(a) and 1365(f))**

135. Plaintiff re-alleges and incorporate all of the preceding paragraphs as if fully set forth herein.

136. Defendant has not accurately certified compliance with the General Permit in each of the annual reports submitted to the Regional Board since at least March 21, 2012.

137. Each day since at least March 21, 2012, that Defendant does not accurately certify compliance with the General Permit is a separate and distinct violation of the General Permit and Section 301(a) of the Act, 33 U.S.C. § 1311(a). Defendant continues to be in violation of the General Permit's certification requirement each day they maintain an inaccurate certification of its compliance with the General Permit.

138. By committing the acts and omissions alleged above, WIGGINS is

COMPLAINT

subject to an assessment of civil penalties for each and every violation of the CWA occurring from January 13, 2011 to the present, pursuant to sections 309(d) and 505 of the Act, 33 U.S.C. §§ 1319(d), 1365, and 40 C.F.R. § 19.4.

139.  An action for injunctive relief is authorized by Act section 505(a), 33 U.S.C. § 1365(a). Continuing commission of the acts and omissions alleged above would irreparably harm Plaintiff and the citizens of the State of California, for which harm WISHTOYO has no plain, speedy, or adequate remedy at law.

140.  An action for declaratory relief is authorized by 28 U.S.C. § 2201(a) because an actual controversy exists as to the rights and other legal relations of the Parties.

WHEREFORE, Plaintiff prays for judgment against Defendant as set forth hereafter.

## RELIEF REQUESTED

Wherefore, Plaintiff respectfully requests that this Court grant the following relief:

a.  Declare Defendant(s) to have violated and to be in violation of the Act as alleged herein;

b.  Enjoin Defendant(s) from discharging polluted storm water from the Facility unless authorized by the Permit;

c.  Enjoin Defendant(s) from further violating the substantive and procedural requirements of the Permit;

COMPLAINT

d.   Order Defendant(s) to immediately implement storm water pollution control technologies and measures that are equivalent to BAT/BCT and prevent pollutants in the Facility's storm water from contributing to violations of any water quality standards;

e.   Order Defendant(s) to comply with the Permit's monitoring and reporting requirements, including ordering supplemental monitoring to compensate for past monitoring violations;

f.   Order Defendant(s) to prepare a SWPPP consistent with the Permit's requirements and implement procedures to regularly review and update the SWPPP;

g.   Order Defendant(s) to provide Plaintiff with reports documenting the quality and quantity of their discharges to waters of the United States and their efforts to comply with the Act and the Court's orders;

h.   Order Defendant(s) to pay civil penalties of up to $37,500 per day per violation for each violation of the Act since January 13, 2012, up to and including November 2, 2015, and up to $51,570 for violations occurring after November 2, 2015 pursuant to Sections 309(d) and 505(a) of the Act, 33 U.S.C. §§ 1319(d), 1365(a) and 40 C.F.R. §§ 19.1 - 19.4;

i.   Order Defendant(s) to take appropriate actions to restore the quality of waters impaired or adversely affected by their activities;

j.   Award Plaintiff's costs (including reasonable investigative, attorney, witness, compliance oversight, and consultant fees) as authorized by the Act, 33 U.S.C.

§ 1365(d); and,

k.  Award any such other and further relief, as this Court may deem appropriate.

Dated: _____3/21_____, 2017

Respectfully submitted,

By: _____
Gideon Kracov
Attorneys for Plaintiff

COMPLAINT

43